## MARION TRUST COMPANY, RECEIVER,
### *v.* BENNETT ET AL.

[No. 20,947. Filed November 26, 1907.]

1. CONSTITUTIONAL LAW.—*Corporations.—Special Acts.—Amendments.*—The constitutional provision (Art. 11, §13) inhibiting the creation, by special act, of corporations other than banking, should be interpreted so that it shall be impossible, by special law, to alter the existing charter of a corporation, created by special act prior to 1851, so as to make it virtually a new corporation. p. 350.

2. WORDS AND PHRASES.—*"Create."—Constitutional Law.*—The word "create," as used in the Constitution (Art. 11, §13), providing that "corporations, other than banking, shall not be created by special act," includes not only a literal creation, but also a fundamental change in the charter of the corporation. p. 350.

3. CORPORATIONS.—*Capital Stock.—Change of.—Statutes.*—A change in the amount of the capital stock of a corporation cannot be made without clear statutory authority. p. 350.

4. CONSTITUTIONAL LAW. — *Corporations. — Creation by Special Statute.*—The act of 1873 (Acts 1873, p. 162), permitting the stockholders to increase the capital stock of a private corporation

Marion Trust Co. *v.* Bennett—169 Ind. 346.

chartered by special act of the legislature of 1832 (Acts 1832, p. 144), is unconstitutional, as in violation of the Constitution (Art. 11, §13) providing that "corporations, other than banking, shall not be created by special act." p. 350.

5. CORPORATIONS —*Subscription to Capital Stock.—Contracts.—Consideration.—*A subscription to the capital stock of a corporation is unenforceable, where such corporation has no legal capacity to issue the stock. p. 351.

6. SAME.—*Capital Stock.—Unpaid Subscriptions.—Collection of.— Estoppel.—Receivers.*—Where the corporation had no power to issue the stock, the receiver of an insolvent corporation cannot enforce its unpaid stock subscriptions on the ground that the subscribers were estopped, because of their conduct, from asserting such incapacity. p. 351.

7. SAME.—*Capital Stock.—Misrepresentations of.—Fraud.—Torts. —Action.*—Creditors, who have been defrauded by reason of misrepresentations as to the capital stock of a corporation may maintain an action in tort for damages against the individuals making such misrepresentations. p. 353.

8. SAME.—*De Facto.—Unconstitutional Statute.*—An unconstitutional statute purporting to authorize a corporation to increase its capital stock is an absolute nullity. p. 358.

9. SAME.—*Capital Stock.—Increase of.—Statutes.—Insurance.*—An insurance company chartered by special act in 1832 (Acts 1832, p. 144) which increases its capital stock by virtue of the invalid, special, amending statute of 1873 (Acts 1873, p. 162) cannot justify such increase under §4840 Burns 1894, §3709 R. S. 1881, providing that insurance companies "organized under this act" may increase their capital stock, nor under §3449 Burns 1901, Acts 1883, p. 135, §5, providing for the increase of the capital stock of the specially chartered corporations accepting same, since the corporation involved attempted to operate only under said act of 1873. p. 358.

10. SAME.—*Capital Stock.—Validity.—Subscriptions.—Assumption of Payment of.—Bills and Notes.*—The assumption of the payment of notes given for shares of the capital stock of a corporation creates no liability, where the corporation had no legal capacity to issue such stock. p. 359.

11. APPEAL.—*Special Findings.—Omissions.—Evidence.—Judgment. —Amendments.*—A judgment rendered upon special findings which omit a fact the truth of which appears uncontradicted in the evidence will be upheld by the Supreme Court, the defect being one of form which should be deemed as amended, on appeal, by virtue of §700 Burns 1908, §658 R. S. 1881, providing that no case shall be reversed on account of defects amendable in the trial court, p. 359,

**12. CORPORATIONS.—*Stock.—Invalid.—Evidence.*—**Where the char-
ter of a private corporation authorized its capital stock to be
$100,000, and a subsequent unconstitutional act authorized an in-
crease to $200,000, evidence of a subscription for $120,000 of the
capital stock affirmatively shows that the corporation had ex-
ceeded its authority, whether such subscription related to the
original or subsequent issue. p. 360.

From Vanderburgh Circuit Court; *Louis O. Rasch,* Judge.

Action by the Marion Trust Company, as receiver of the
Citizens Insurance Company, against Henry S. Bennett and
others. From a judgment for defendants, plaintiff appeals.
*Affirmed.*

*Iglehart & Taylor* and *W. H. Latta,* for appellant.
*C. A. DeBruler, J. D. Welman* and *G. R. DeBruler,* for
appellees.

GILLETT, J.—This action was brought by appellant, the
receiver of the Citizens Insurance Company of Evansville,
Indiana, against appellees Alexander Hutchinson, Henry S.
Bennett and Isaac H. Odell. The case is before us on ex-
ceptions to the court's conclusions of law.

It appears from the findings that said company is an in-
surance corporation, organized under an act of the General
Assembly approved February 3, 1832 (Acts 1832, p. 144),
as amended by an act approved March 6, 1873 (Acts 1873,
p. 162), and that on August 1, 1890, said company increased
its capital stock from $100,000 to $200,000. The firm of
Bennett & Odell, who were agents for said company, became
the owner of 240 shares of its stock, of the par value of $50
each, and on February 3, 1894, they executed to said com-
pany certain notes for the balance due on said stock, payable
as calls were made. About one month later Bennett bought
Odell's interest, and immediately thereafter Bennett formed
a partnership with Hutchinson for the purpose of carrying
on the fire insurance business, which partnership continued
down to the bringing of this action. It is stated in one of
the findings that Hutchinson assumed all of the liabilities

of the firm of Bennett & Odell, but, taking the findings as a whole, and reading them in the light of the evidence, we think that it should be understood that the fact was that when Odell retired Bennett assumed and agreed to pay all of the debts of the firm, and that Hutchinson, in terms, guaranteed said contract, but that, as said stock notes were omitted from the list of liabilities furnished Hutchinson at the time, and as he had no actual notice or knowledge that the stock was not paid for, it was not his intent to guarantee the payment of said notes. When Hutchinson became a partner, the stock certificates passed into his hands, but they were never transferred to him upon the books of the corporation, and he gave the certificates to Odell. In the same year, however, Odell was notified by Hutchinson to return such certificates, and he notified the insurance company that he was the owner of said stock, and not to transfer it to Odell. Bennett brought an action in his own name to secure possession of such certificates, and as a result they were turned over to his attorneys, where they have since remained. It is found that it was to the advantage of said firm to have said stock; that after receiving said notice the insurance company at all times recognized Hutchinson & Bennett as the owners of said stock, and that until a date in 1898 Bennett voted said stock, and, by virtue thereof, acted as a director of said company. During 1898 two calls, of ten per cent each, were issued by the directors of the corporation, and, upon the appointment of a receiver thereof, the court ordered an assessment of fifty per cent additional.

The special act under which the Citizens Insurance Company of Evansville, Indiana (originally known as the Lawrenceburgh Insurance Company), was incorporated provided that it should have a capital stock of $100,000 (Acts 1832, *supra*), while the act of 1873, *supra,* provided that said capital stock "may be increased from time to time, to such additional sum or sums as may be determined upon by a vote of the majority in value of stockholders."

The first question which presents itself is whether the provision just quoted is in violation of §13, article 11, of the state Constitution, which provides that "corporations, other than banking, shall not be created by special act," etc. This prohibition relative to the creation of corporations does not admit of exact definition. It is evident, however, that the provision should be so interpreted as to render it impossible for the General Assembly by special law to alter an existing charter in such manner as, in effect, to make a new corporation. *In re Bank of Commerce* (1899), 153 Ind. 460, 47 L. R. A. 489; *Town of Longview* v. *City of Crawfordsville* (1905), 164 Ind. 117, 68 L. R. A. 622; 1 Morawetz, Priv. Corp. (2d ed.), §12; Clark, Priv. Corp. (Tiffany's ed.), p. 39. To give a close or literal interpretation to the word "create" would make it possible, after a corporation had been brought into existence under a valid law, so to fashion the organization as practically to bring upon the people of the State the evil of special privilege which it was designed to avoid. A change in the amount of the capital stock of a corporation, like a change in the objects thereof, is fundamental, and cannot be made without clear legislative authority. *Chicago, etc., R. Co.* v. *Allerton* (1873), 18 Wall. 233, 21 L. Ed. 902; *McNulta* v. *Corn Belt Bank* (1897), 164 Ill. 427, 45 N. E. 954, 56 Am. St. 203; note to *Peck* v. *Elliott* (1897), 38 L. R. A. 616; Clark, Priv. Corp. (Tiffany's ed.), p. 346. What then shall be said of a special act which attempts to change a corporation of limited capital stock to one in which the whole matter of the extent of the capital stock is left to the stockholders? It is clear, in our opinion, since the corporation in question was limited to $100,000 capital by the act of its creation, that the provision of the act of 1873, *supra,* whereby there was attempted to be conferred upon the association the capacity of infinite growth, so that it might bulk with the largest of corporations, was unconstitutional and void,

as an attempt to create an insurance corporation by special act.

The undertaking of a subscriber to the capital stock of a corporation must find a correlative in the capacity of the corporation, if it be a going concern, to deliver such 5. stock, and if the association be without capacity in that behalf the undertaking of a subscriber is a *nudum pactum.*

It is urged that Bennett & Hutchinson are estopped by their conduct to deny their liability. The receiver in this case does not pretend to represent the interest of any 6. particular creditor, but to represent all, irrespective of their having grounds of estoppel. In these circumstances, it can only be said that he stands on no higher plane than the corporation itself. As between the corporation and its stockholders, subscriptions to a wholly unauthorized issue of stock cannot be validated on the principle of estoppel.

In *Stace & Worth's Case* (1869), L. R. 4 Ch. \*682, an attempt was made to charge certain holders of such an issue of stock, on the ground that they had accepted shares; that their names appeared on the register of shareholders, and that they had sat as directors of the corporation. Vice Chancellor James, however, declared: "This was a void agreement, with a void acting upon it, a void recognition and a void ratification by the acts which have been mentioned. It comes to an aggregate of nothings, and that aggregate of nothings is all that there is to fix those gentlemen on the list of stockholders."

Upon the question under consideration the case of *Scovill* v. *Thayer* (1881), 105 U. S. 143, 26 L. Ed. 968, is the leading authority. In that case the law under which the corporation was organized authorized any corporation to increase its capital stock in any amount not exceeding double its authorized capital. The corporation, after so increasing its capital, had made two further issues of stock,

and the question was as to the right of its assignees in bankruptcy to recover on an assessment ordered by the court against a holder of shares in the corporation, on account of his subscription to the over issues, it appearing that, in addition to accepting the stock, he had attended by proxy the meetings of the stockholders at which the third and fourth issues were voted. The court said: "In this case the attempt to increase the stock of the company beyond the limit fixed by its charter was *ultra vires*. The increased stock itself was, therefore, void. It conferred on the holders no rights and subjected them to no liabilities. If the stock of the first and second issues had been held by one set of holders, and the stock of the third and fourth by another, in a contest between them the latter would have been excluded from all participation in the management of the company or in its profits. To decide that the holders of stock issued *ultra vires* have the same rights as the holders of authorized stock is to ignore and override the limitations and prohibitions of the charter. We think it follows that if the holder of such spurious stock has none of the rights, he can be subjected to none of the liabilities of a holder of genuine stock. His contract to pay for spurious shares is without consideration and cannot be enforced. It is insisted, however, that the defendant having attended by proxy the meetings at which the increase of the stock beyond the limit imposed by law was voted for, and having received certificates for the stock thus voted for, and after such increase the company by its agents having held itself out as possessing a capital of $400,000, and invited and obtained credit on the faith of such representations, he is now estopped from denying the validity of the stock and his obligation to pay for it in full. We think that he is not estopped to set up the nullity of the unauthorized stock. It is true that it has been held by this court that a stockholder cannot set up informalities in the issue of stock which the corporation had the power to create. *Upton* v.

*Tribilcock* [1875], 1 Otto (U. S.) 45, 23 L. Ed. 203; *Chubb* v. *Upton* [1877], 5 Otto (U. S.) 665, 24 L. Ed. 523; *Pullman* v. *Upton* [1877], 6 Otto (U. S.) 328, 24 L. Ed. 818. But those were cases where the increase of the stock was authorized by law. The increase itself was legal and within the power of the corporation, but there were simply informalities in 'the steps taken to effect the increase. These, it was held, were cured by the acts and acquiescence of the defendant. But here, the corporation being absolutely without power to increase its stock above a certain limit, the acquiescence of the shareholder can neither give it validity, nor bind him or the corporation. 'A distinction must be made between shares which the company had no power to issue and shares which the company had power to issue, although not in the manner in which, or upon the terms upon which, they have been issued. The holders of shares which the company had no power to issue, in truth had nothing at all, and are not contributors.' * * * As forcibly suggested by counsel, a creditor, who has been defrauded by misrepresentation of the real capital of the company, has his remedy in an action of tort against all who participated in the fraud. But the wrong done to him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders, who have taken no part in it.''

In *Winters* v. *Armstrong* (1889), 37 Fed. 508, a national bank had attempted to increase its capital stock without securing the consent of the comptroller. The bank passed into the hands of a receiver, and he brought an action on certain stock notes given on account of such unauthorized issue. The defendants answered no consideration, to which the receiver replied by way of estoppel, to the effect that after the attempted increase the bank, by means of circulars and statements upon the letter-heads represented its

capital stock at $2,000,000, which was the amount to which it was proposed to increase the stock, and that said bank also advertised its capital stock at said amount in the newspapers of the city in which it was located, all of which was done with the knowledge of the defendants, and that with such knowledge they allowed their names to remain on the subscription list until the bank went into the hands of a receiver. Mr. Justice Jackson, delivering the opinion of the court, said: "National banking associations have no authority of law by their own action to increase their capital stock to any amount whatever. They can make no increase to any extent, without the approval of the comptroller as the representative of the government. * * * In effecting an increase of its capital stock the association may, so far as relates to its own action, proceed in an irregular or informal manner, which a stockholder who has acquiesced therein may not, as against either the corporation or its creditors, take advantage of or insist upon as invalidating his subscription, or the stock issued to him thereunder. But in regard to the sovereign's consent to such increase, to be expressed in and by the approval of its comptroller of the currency, that is an essential prerequisite or condition precedent, like a special enabling act, in conferring the power and authority to make the proposed increase valid. Such approval involved the grant of power to complete and perfect the proceedings commenced by the association looking to an increase of its capital stock. It is something lying beyond the action or control of the association and its stockholders seeking to effect an organic and fundamental change in the constitution of the bank; and in respect to this essential thing, in nowise involved in the action or steps taken by the association, the question of irregularity or informality in its own mode of procedure, and the consequences thence resulting, do not apply. * * * The authorities brought to our attention do not support such an extension of the doctrine of estoppel, which

is never invoked to confer corporate powers. No estoppel can properly arise in any case where the party's direct and affirmative act could not have made the transaction valid. What the Fidelity Bank did in misrepresenting what did not lie within its power or that of its stockholders to do by their own action, cannot, upon any sound principle, be taken and accepted as the equivalent of, or the substitute for, the power it did not possess. Parties deceived or misled to their damage by such misrepresentations must seek relief against those making or responsible for the false statement, as individuals, but cannot look to them in the character of stockholders created under the operation of an estoppel, in the absence of power on their part or that of the association to establish that relation. This conclusion is sound in principle, and is, as we think, supported by the authorities.''

It was held in *Clark* v. *Turner* (1884), 73 Ga. 1, that an issue of stock which was wholly unauthorized by statute was *ultra vires* and void. Concerning a claim of estoppel the court said: ''If this subscriber had induced insurance on the part of any person in the Grangers' Life and Health Insurance Company by his acts as trustee or agent, or on the faith of his subscription, then an action on his individual right for the tort against Turner would lie; but this assignee stands in the shoes of the corporation and sues for the benefit of all creditors, and there is no pretense in this record that any particular creditor was induced or influenced by his action to insure in the company. *Scovill* v. *Thayer* [1881], 105 U. S. 143, 26 L. Ed. 968. So that neither the corporation nor its general assignee can recover in this suit, on the facts which the record discloses.''

See, also, *Ross-Meehan, etc., Foundry Co.* v. *Southern, etc., Iron Co.* (1896), 72 Fed. 957; *American Tube Works* v. *Boston Mach. Co.* (1885), 139 Mass. 5, 29 N. E. 63; *Reed* v. *Boston Mach. Co.* (1886), 141 Mass. 454, 5 N. E. 852; *Kampman* v. *Tarver* (1895), 87 Tex. 491, 29 S. W. 768;

*Schierenberg* v. *Stephens* (1888), 32 Mo. App. 314; *Muncie
Nat. Gas Co.* v. *City of Muncie* (1903), 160 Ind. 97, 60 L.
R. A. 822.

There being no element of estoppel in the case as between
the stockholders and the corporation, the further proposi-
tion, that the receiver cannot, at least irrespective of indi-
vidual right, bring forward an estoppel on behalf of the
whole body of creditors, is well illustrated by the late case
of *Ellison* v. *Ganiard* (1906), 167 Ind. 471, in which there
was the contention, made on behalf of the plaintiff, a trus-
tee in bankruptcy, that the defendants, who were claimants
under a declaration of trust, executed by the insolvent in
connection with a deed made to him by a third person,
were estopped to assert such right as against the creditors,
because such claimants had neglected to record such decla-
ration, and had permitted the deed to the insolvent, which
was absolute upon its face, to remain recorded and unques-
tioned, with a result that certain of the creditors had ex-
tended credit to him on the strength of his apparent owner-
ship. In disposing of this contention, we said: "It is
contended that appellee is invested with the power to as-
sert this estoppel against appellants for the benefit of all
the creditors of the bankrupt. But the facts as established
show that out of the 800 creditors, but two, Shoup and
Walters, can be said to have any basis whatever for assert-
ing or invoking the principle of estoppel against appel-
lants. Conceding, for the sake of argument, without decid-
ing, that these two creditors, under the evidence, have the
right successfully to assert an estoppel against appellants,
certainly these facts alone would not, under the law, justify
appellee, as trustee, to maintain this suit and thereby, as he
has succeeded in doing under the judgment of the trial
court, bring all of the property in controversy into the estate
of the bankrupt to be disposed of for the benefit of all of
the insolvent's creditors. This proposition is so manifestly

true that, it appears to us, nothing can be said to the contrary. A case which very much supports the proposition we assert is *Audenried* v. *Betteley* [1862], 87 Mass. 382, 81 Am. Dec. 755. In that appeal it was claimed that a contract between the plaintiffs and the insolvent was made in order to enable the latter to obtain a false credit in conducting his business in the purchase of merchandise and the borrowing of money upon the strength of the possession of property which apparently belonged to him. It was held therein by the court that an assignment under the insolvent laws of the state of Massachusetts did not vest in the assignee title to property which had been placed in the hands of the insolvent for the fraudulent purpose of giving him a false credit, although some of his creditors may have been defrauded thereby. The question of estoppel in that case, as in this, was advanced by the parties and considered by the court. Judge Hoar, in passing upon the question, said: 'An estoppel *in pais,* on the ground of fraud, is personal to the particular creditor defrauded, and does not pass the property so as to inure to the benefit of creditors generally. * * * "To constitute such an estoppel, a party must have designedly made an admission inconsistent with the defense or claim which he proposes to set up, and another party have, with his knowledge and consent, so acted on that admission that he will be injured by allowing the admission to be disproved; and this injury must be coextensive with the estoppel." ' If the two creditors in question, or any other of the 800, have a right successfully to assert an estoppel against appellants, it is a matter personal to them, and they may avail themselves of such an estoppel, in a suit against appellants to subject the lands in question to the payment of their respective claims."

As the provision of the act of 1873 relative to an increase of the capital stock was unconstitutional, it could

afford no basis for an irregular, or, as it might be termed, a *de facto* issue of stock, for an unconstitutional enactment purporting to authorize an increase of capital stock is a nullity. *Clark* v. *American, etc., Coal Co.* (1905), 165 Ind. 213, 112 Am. St. 217. The entire authority of the corporation to issue stock rested on the act of 1832, and that act, in legal effect, limited the capital to $100,000. As was said in *Ross-Mehan, etc., Foundry Co.* v. *Southern, etc., Iron Co., supra,* in which the principle of estoppel was also sought to be invoked to enforce a subscription to an over issue of stock: ''Where the power is wanting it can make no difference in the effect whether this lack of power results from an express limitation or a limitation by implication.''

It is contended, however, that the increase of stock was only irregular and not void, since there was in force between the years of 1853 and 1891 a general law relative to stock insurance companies which permitted an increase of stock to an amount not exceeding $500,000. §4840 Burns 1894, §3709 R. S. 1881. The authority thereby granted is, to quote the words of the statute, confined to any insurance company ''organized under this act.'' Said enactment does not even give the Citizens Insurance Company a standing as a *de facto* corporation, since it did not attempt to organize under said act. *Tulare Irrigation District* v. *Shepard* (1902), 185 U. S. 1, 46 L. Ed. 773, 22 Sup. Ct. 531; *In re Gibbs's Estate* (1893), 157 Pa. St. 59, 27 Atl. 383, 22 L. R. A. 276. The finding is that said corporation was organized under the act of 1832 as amended by the act of 1873. A corporation thus organized would differ essentially from a corporation organized under the law of 1853; their rights and duties would be different, and, in said circumstances, it appears plain to us that a corporation which is organized under a special law cannot claim a *de facto* existence under a law which it does not recognize as its charter. It is equally plain that the

issuance of the additional stock cannot be justified by §4076 Burns 1908, Acts 1883, p. 135, §5, which is a part of an act, passed in 1883, authorizing the extension of the corporate life of corporations, chartered by special act before the Constitution took effect, for the period of thirty years. Assuming, without deciding, that said section may be disentangled from that portion of the act held unconstitutional in *In re Bank of Commerce* (1899), 153 Ind. 460, 47 L. R. A. 489, it is enough to say that as to corporations enjoying special charters in perpetuity, it was necessary for them to accept said act in order to enjoy its privileges, and that the terms of the act would have operated to repeal the law under which the original charter was granted. The special finding speaks negatively when it finds that said corporation is organized under the act of 1832, *supra,* as amended by the act of 1873, *supra.*

We have already indicated that it appears to us that Hutchinson did not assume to pay the subscription of Bennett & Odell. The assumption of the notes by Bennett, if comprehended by the agreement, must be held to be based on the correlative duty of the corporation to deliver the stock subscribed for, and if the association was never in a position to do this, and cannot now deliver even what would represent Bennett's interest in the charter, it would be making a new contract to charge him with the stock notes, waiving performance by the association. *Merrill* v. *Beaver* (1877), 46 Iowa 646; *Kampman* v. *Tarver* (1895), 87 Tex. 491, 29 S. W. 768.

It is, however, insisted by counsel for appellant that the findings are not sufficiently full to exclude the idea that the stock obtained by Bennett & Odell was a part of the four-fifths of the original capital stock, which, under the original act, the board of directors was empowered to sell at such times as it might direct. This insistence may be granted, and it is true that we have no power, generally speaking, to add to a special finding. We may, how-

ever, give heed to a fact appearing in the evidence which does not admit of dispute, in order to uphold the judgment. *Dyke* v. *Spargur* (1894), 143 N. Y. 651, 38 N. E. 269; *Sturgeon* v. *Hull* (1894), 8 Ohio C. C. 269. Such a case, in our opinion, is one of a defect in form, or imperfection contained in the proceedings, which the statute provides shall be deemed amended in the Supreme Court. Section 700 Burns 1908, §658 R. S. 1881; 2 Thornton's Civ. Code, p. 1007.

Appellees put in evidence all of the entries in the stock-book of the Citizens Insurance Company. This book shows stock certificates, of date August 1, 1890, aggregating approximately $190,000. The stock certificates introduced by the receiver as issued to Bennett & Odell were dated respectively October 20, 1890, November 8, 1890, and March 6, 1894, and this corresponds with the stock-book entries of stock held by said firm. It may be inferred that these certificates in part stand for earlier subscriptions made by Bennett and Odell severally, but the earliest one, made by Bennett, was a part of the issue of August 1, 1890, and is preceded, in the order of entry upon the book, by certificates to the amount of more than $113,000. It is alleged in the complaint that the notes were given as and for the unpaid balance of the purchase price of stock of said corporation subscribed for on February 3, 1894; and the finding of the court is that on said day Bennett & Odell became indebted to said company in the amount represented by said notes for and on account of the issue to them of 240 shares of its stock. Upon this state of the record there is no room for the inference that the shares in question were unsold stock of the old corporation. The stock was either part of an issue in excess of $100,000, or else, if the corporation had not before issued stock to the full amount of its authorized capital, the new issue, which Bennett and Odell, either severally or jointly subscribed for, brought the amount of outstanding stock up to a sum

far in excess of the authority of the corporation to issue it, and as there is no means of distinguishing the legal from the illegal the whole must fail. *Kampman* v. *Tarver, supra.* And see *Gas Light, etc., Co.* v. *City of New Albany* (1901), 156 Ind. 406.

Judgment affirmed.·